UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHANIE STEPHANS,

     Plaintiff,

v.

WEST BLOOMFIELD TOWNSHIP, WEST
BLOOMFIELD TOWNSHIP FIRE
DEPARTMENT, LISA HEINIG, TIMOTHY
TOROK, and RICHARD PAUL,

     Defendants.

Case No. 13-14877
Honorable Laurie J. Michelson
Magistrate Judge Michael J. Hluchaniuk

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [34]**

---

Plaintiff Stephanie Stephan[1] had a seizure and lost consciousness after a Tae Kwon Do class. Four firefighter-paramedics and a police officer responded to assist her. Once she came to, Stephan became angry because she thought that one of the firefighters tacitly mocked her for speaking Chaldean on a phone call to her mother. So she lashed out, throwing her phone toward him, cursing at him, and walking angrily toward him. The police officer restrained her, grabbing her right arm and forcing her toward the ground. Another firefighter, Defendant Tanya Heinig, helped the officer. Stephan says Heinig jumped on her, yanked her left arm above her head, and applied so much pressure on top of her that she could not breathe.

Stephan sued three of the four firefighter-paramedics who were at the scene that day, but not the officer. She also sued the city and fire department that employed the firefighter-paramedics. She claims that the individual Defendants violated her constitutional rights by using

---

[1] Plaintiff's response brief (Dkt. 41) includes three different spellings of her last name: "Stephens," "Stephans," and "Stephan." The Court will use "Stephan," the name she stated in her deposition.

excessive force. She also claims that the city and fire department had a policy, custom, or practice sanctioning constitutional violations. She finally claims that Defendants' conduct amounted to gross negligence, assault and battery, and ethnic intimidation in violation of Michigan law.

Before the Court is Defendants' Motion for Summary Judgment on all of Stephan's claims. (Dkt. 34, Def.'s Mot. Summ. J.) After careful consideration of the briefs and thorough review of the record, the Court finds that oral argument will not aid in resolving the pending motion. *See* E.D. Mich. LR 7.1(f)(2). The Court finds that Stephan has raised a genuine issue of material fact concerning whether Heinig used excessive force. But Stephan has not shown that any Defendant's conduct otherwise violated her constitutional rights or Michigan law.

## I.

On summary judgment, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party, here Stephan. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A.

Plaintiff Stephanie Stephan is a second degree black belt in Tae Kwon Do. (Dkt. 41, Pl.'s Resp. Ex. E, Stephan Dep. at 14.) On November 28, 2011, she had a grand mal seizure at Master Kwang Han's Dojo, a Tae Kwon Do martial arts studio in Keego Harbor, Michigan. (*Id.* at 16, 21; Pl.'s Resp. Ex. F, Han Dep. at 5.) Stephan and Han were alone when it happened. (Stephan Dep. at 20–21; Han Dep. at 18.) She was 21 years old at the time. (Pl.'s Resp. Ex. B, Incident Rep.)

Han helped her down to a mat after her seizure started. (Han Dep. at 23–24.) Stephan lost consciousness at some point. (Stephan Dep. at 25.) So Han called 911, and he eventually called Stephan's mother as well. (Han Dep. at 18; Pl.'s Resp. Ex. I, Glashauser Dep. at 13–14.)

Several firefighter-paramedics from Defendant West Bloomfield Township responded, including Defendant Timothy Torok, Defendant Tanya Heinig, Defendant Lieutenant Richard Paul, and non-party Ryan Glashauser. (Stephan Dep. at 28–33.) A Keego Harbor police officer, non-party Robert Barnes, was also dispatched to the scene. (Pl.'s Resp. Ex. J, Barnes Dep. at 7, 9.)

West Bloomfield Township responders had treated Stephan for seizures many times before. (Pl.'s Resp. Ex. A, Runsheets.) Glashauser, for instance, had done around 15 "runs" responding to Stephan. (Glashuaser Dep. at 9.) Torok had done around five runs. (Pl.'s Resp. Ex. H, Torok Dep. at 13.) Heinig had not had any direct contact with Stephan, but she was familiar with Stephan's name and knew that she was a seizure patient. (Pl.'s Resp. Ex. G, Heinig Dep. at 9–10.) Paul also had not encountered Stephan before but had heard "there could be problems with her." (Pl.'s Resp. Ex. K, Paul Dep. at 11.) As he noted in his testimony, a patient "coming out of a seizure sometimes can be very disoriented and violent at times." (*Id*. at 13.)

When the responders arrived, Stephan was still unconscious. (Stephan Dep. at 25–26.) While waiting for Stephan to come to, Glashauser spoke with Stephan's mother over the phone. (Glashauser Dep. at 13.) He bent down and tapped Stephan to see if she was conscious. (*Id*. at 14.) In response, she unconsciously punched him in the leg. (*Id*.; Stephan Dep. at 39.) As Glashauser says, "[T]his is kind of common for Stephanie. . . . [W]hen we show up on the scene . . . we usually kind of just let her come around when she's ready to come around, because she's usually agitated when we first get there." (Glashauser Dep. at 14.)

Stephan regained consciousness after she hit Glashauser: "I wasn't completely there . . . But I remember [Heinig] telling me, [y]ou hit one of our men, you hit one of our men, that's assault and battery, and that I can go to jail." (Stephan Dep. at 25–26.) Others recall that Paul, not Heinig, said something to that effect. (Glashauser Dep. at 15; Paul Dep. at 15–16.) Heinig says that at this time she had just entered the dojo and began to assess Stephan, taking her vitals and questioning her about her medical history. (Heinig Dep. at 16–17.) Stephan does not recall Heinig doing that. (Stephan Dep. at 57.)

Glashauser then handed Stephan the phone so she could talk with her mother. (*Id*. at 29.) She started to tell her mother that someone had threatened to take her to jail. (*Id*. at 36.) But she spoke in Chaldean so the responders would not be able to understand her—to avoid "caus[ing] more heat." (*Id*. at 36.)

According to Stephan, her telephone conversation frustrated Paul, who laughed at her, mocked her, smirked, and rolled his eyes. (*Id*. at 33–37, 41–44.) As Stephan says, he was "egging [her] on." (*Id*. at 37.) For his part, Paul and others say that he just crossed his arms and nodded his head with his eyes closed. (*See*, *e.g.*, Paul Dep. at 9–10; Glashauser Dep. at 17.) Nevertheless, the fire department later wrote him up for "[a]ntagonistic [b]ehavior." (Pl.'s Resp. Ex. M, Verbal Counseling; Paul Dep. at 8.) He was not otherwise disciplined for the incident. (Paul Dep. at 9; Pl.'s Resp. Ex. L, Flynn Dep. at 23.)

Stephan thought that Paul mocked her because she had spoken Chaldean. (Stephan Dep. at 37.) So, she "got like really angry," told Paul that "he was garbage," and "swore" and "yell[ed]" at him. (*Id*. at 37, 45, 51.) Stephan does not remember what she said but concedes, "I didn't say nice things obviously." (*Id*. at 45.) Others recall that she "scream[ed] obscenities," told

4

Paul that he "messed with the wrong person," and told him she would "kick his ass." (Heinig Dep. at 21, 24; Torok Dep. at 23; Paul Dep. at 24; Glashauser Dep. at 17–18.)

Stephan not only screamed at Paul but also threw her phone toward him. (Stephan Dep. at 37, 46; Paul Dep. at 20.) She says that she did not intend to throw it at him and that "it was very far from hitting anybody." (Stephan Dep. at 37.) Others say she threw the phone at Paul. (Paul Dep. at 24; Glashauser Dep. at 17.) The phone hit the ground near a half wall that was between Paul and Stephan. (Stephan Dep. at 46.)

A visibly upset Stephan then stormed in "an angry walk" toward Paul. (Stephan Dep. at 47, 49.) She acknowledges that at this point, "I think they felt like I was going to fight or do something, because I do Tae Kwon do, you know." (Stephan Dep. at 47.) But she insists that she did not walk at *Paul*. She wanted to leave the dojo and had to walk by him to do that. (Stephan Dep. at 47.) Others say she lunged or came directly at Paul. (Torok Dep. at 23; Paul Dep. at 24; Barnes Dep. at 19; Heinig Dep. at 21.) Officer Barnes says she actually swung her arms and struck Heinig, though no one else testified to that. (Barnes Dep. at 19.)

Barnes then grabbed Stephan's right arm and pulled her toward the ground. (Stephan Dep. at 52.) She told him he was hurting her, and he said, "You need to stop fighting, or it's going to hurt more." (*Id*. at 54.)

Though Barnes had already grabbed ahold of Stephan (who weighed only about 70 pounds (Glashauser Dep. at 53)), Heinig intervened to assist him. Stephan describes Heinig as a "monster." (Stephan Dep. at 53.) Stephan claims Heinig grabbed her left arm "and tried to force [Stephan] on [her] head." (Stephan Dep. at 52.) Heinig used her knee or whole body weight to apply pressure to Stephan to the point that Stephan could not breathe. (*Id*. at 54.) She also raised Stephan's left arm "way up." (*Id*. at 54, 56; Han Dep. at 46.) Heinig claims that she neither

5

raised Stephan's arm nor put any weight on her. (Heinig Dep. at 23, 26.) But Stephan says she "felt [her] arm like make a noise" or "crack." (Stephan Dep. at 54, 56.) So, she screamed, "I had five shoulder surgeries, get up . . . [y]ou dislocated my shoulder." (*Id*. at 56.) Heinig immediately "jumped" or "popped" off of Stephan. (*Id*. at 47, 56.) During the scuffle, Han tried to intervene, but Barnes told him to stay back. (Barnes Dep. at 26; Glashauser Dep. at 35.)

Barnes then asked Stephan whether she was calm enough to sit and talk to Heinig, and Stephan said yes. (Stephan Dep. at 58.) She went to a back room at the dojo and spoke with Heinig there. (*Id*. at 59–60.) Heinig tried to explain that she had seizures and understood how Stephan felt. (*Id*. at 58.) Stephan's sister then picked her up from the dojo. (Barnes Dep. at 18.) Officer Barnes chose not to arrest Stephan: "I wasn't going to effect an arrest because . . . her medical condition is a factor in this." (Barnes Dep. at 35.)

**B.**

Several days after the incident, Stephan sought treatment at urgent care and at a hospital for her injured shoulder. (Stephan Dep. at 67–68.) Stephan says that Heinig's force dislocated her left shoulder. (Stephan Dep. at 67.) She also says exams at urgent care and the hospital confirmed that. (*Id*. at 67–68.) But an exam record notes that "[t]here is no evidence of significant degenerative disease or fracture or dislocation." (Pl.'s Resp. Ex. C. at 4.) According to Dr. Zivit Cohen, who treated her, "[C]linically there was a suspicion of dislocation. However, when we got the radiologist's report, the radiologist did not find it to be dislocated; and when we asked him to look at it further, he concluded that he agreed with his previous note that it was not dislocated." (Pl.'s Resp. Ex. D, Cohen Dep. at 9.)

In any case, Stephan kept doing Tae Kwon Do for a couple of weeks, but she had to stop because her "shoulder just falls out" and "would not stay in." (Stephan Dep. at 10.) Stephan has

also sought counseling. Her therapist, John S. Leone, says the incident contributed to her depression. (Pl.'s Resp. Ex. O, Leone Dep. at 5, 26; Pl.'s Resp. Ex. N, Leone Records at 2.)

**C.**

Close to two years after the incident, Stephan filed a three-count complaint in this Court. (Dkt. 1, Compl.) Count I asserts a § 1983 claim against the individual defendants—Heinig, Torok, and Paul—for "unlawful restraint, imprisonment, racial intimidation, excessive force, humiliation and degradation in depravation of [Stephan's] Constitutional rights which include but are not limited to liberty and freedom from unlawful discrimination and use of force by Defendants." (Compl. ¶ 13.) Though the precise basis of this claim is unclear in the pleadings, the parties' briefs treat it as a Fourth Amendment excessive force claim, so the Court will as well. (Defs.' Mot. at 6–12; Pl.'s Resp. at 3–12.) Count II asserts a claim of "gross negligence" under Michigan law for "unprofessionally escalat[ing] the situation by taunting, bullying, threatening and unlawfully restraining Plaintiff, who otherwise had no control over what was happening to her due to the severity of her medical emergency." (Compl. ¶ 23.) Count III asserts a § 1983 claim against West Bloomfield Township and the West Bloomfield Township Fire Department for "improper training, policy procedures [sic] and culture of retention of abusive/discriminatory first responders which has led to the establishment of a custom and practice to allow first responders who are placed in a role of safety and trustworthiness to abuse and taunt minorities, who may be exceptionally vulnerable because they are having medical emergencies." (Compl. ¶ 29.)

Defendants moved for summary judgment on March 3, 2015. (Dkt. 34, Defs.' Mot. Summ. J.) The parties' briefs also address two claims that were not included as distinct counts in

the Complaint: state law claims of assault and battery and ethnic intimidation. (Defs.' Mot. at 18–19; Dkt. 42, Defs.' Repl. at 5–6; Dkt. 41, Pl.'s Resp. at 12–13, 15.)

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

## III.

The Court will address each of Stephan's claims in turn. The Court finds that Stephan's § 1983 excessive force claim against Heinig raises a genuine issue of material fact, but Stephan's § 1983 claim fails as a matter of law as to all of the other defendants. The Court also finds that Defendants are entitled to summary judgment for Stephan's state law claims of gross negligence, assault and battery, and ethnic intimidation.

### A.

### 1.

The Court first addresses the heart of Stephan's case: whether Heinig used excessive force during her efforts to restrain Stephan. While a close call, the Court finds that Stephan has raised a genuine issue of material fact concerning whether Heinig's force was objectively reasonable and whether she is entitled to qualified immunity.

Qualified immunity shields Heinig from suit if she "reasonably believe[d] that . . . her conduct complie[d] with the law." *See Pearson v. Callahan*, 555 U.S. 223, 244 (2009). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* at 231.

To defeat a qualified immunity defense, "a plaintiff must establish (1) that the defendant violated a 'constitutional right' and (2) that the right 'was clearly established.'" *Leary v. Livingston Cty.*, 528 F.3d 438, 441 (6th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). District courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

The Court begins with the first prong. "The Fourth Amendment prohibits the use of excessive force during the seizure of a free citizen." *Monday v. Oullette*, 118 F.3d 1099, 1104 (6th Cir. 1997). When analyzing excessive force claims, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The "proper application" of the reasonableness test "requires careful attention to the facts

and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. On balance, the *Graham* factors weigh against Heinig: viewing the facts in the light most favorable to Stephan, a reasonable jury could find that Heinig's use of force to restrain her was not objectively reasonable and thus amounted to excessive force in violation of the Fourth Amendment.

First, the "crime at issue" was not severe. Initially, no crime was at issue. Responders encountered Stephan because she had a seizure, not because she committed any crime. Still, Defendants suggest that Stephan was guilty of violating Mich. Comp. Laws Ann. § 750.81d(1), which, among other things, makes it unlawful to assault, resist, obstruct, or oppose a firefighter or paramedic "performing his or her duties." (*See* Defs.' Mot. at 8.) But whether she violated that statute is unclear. No citation was issued. And Officer Barnes chose not to arrest her, citing her medical condition. (Barnes Dep. at 35.) Indeed, many of the firefighter-paramedics knew that Stephan—like many seizure patients—would likely be erratic, volatile, and potentially aggressive as she regained her senses. (Paul Dep. at 13; Glashauser Dep. at 14.)

Second, testimony suggests that Stephan did not legitimately pose a threat to anyone's safety—before or at the precise point Heinig used force. Prior to Heinig's intervention, Stephan was admittedly "confrontational." (Pl.'s Resp. at 8.) But even then, she posed a minimal threat. She first inadvertently punched Glashauser in the leg as she regained consciousness, but she did not hurt him. (Glashauser Dep. at 14.) Granted, she then yelled at Paul, threw her phone toward him, and stormed off in his direction. (*See*, *e.g.*, Stephan Dep. at 44–47.) But as Glashauser commented, "I didn't feel like I was in any harm from Stephanie . . . Mostly because she's 70 pounds, and I'm a grown man." (Glashauser Dep. at 25.) And it does not appear that she posed

any threat when Heinig intervened. By then, Officer Barnes already had ahold of Stephan's right arm and had started to force her to the ground. (Stephan Dep. at 52.)

As for the final *Graham* factor—whether Stephan actively resisted—if it does not favor Stephan, it is at least a wash. No one disputes that Stephan lashed out at Paul, cursing at him and throwing her phone. But Stephan's claim is that immediately before Barnes tried to restrain her, she was not necessarily resisting the responders—she was just trying to leave. (Stephan Dep. at 47.) Once Barnes grabbed her, Stephan says she simply told him that he was "hurting her." In response, he told her, "You need to stop fighting, or it's going to hurt more." (Stephan Dep. at 54.) Stephan also says that Barnes had a hold of her arm "so I wouldn't do anything." (*Id.*) Thus, while it is unclear whether Stephan actively resisted Barnes by the time Heinig joined, a reasonable jury could find that she did not.

Defendants urge that "some amount of force to restrain [Stephan's] efforts to get back up (until she calmed herself) was unquestionably reasonable." (Defs.' Mot. at 8.) Yes, but how much? *See Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) ("[T]he question is not whether any force was justified. It is, instead, whether [the officers] could reasonably use the *degree* of force employed." (emphasis in original)). It is unclear why Heinig even intervened at all. She even testified that it was unnecessary: "Could [Officer Barnes] have done it by himself if he had to? Absolutely. I'm sure. That's what he's trained in." (Heinig Dep. at 25.) Moreover, even though Barnes had already to some extent restrained Stephan, she says that Heinig forced her down on her head, (Stephan Dep. at 52), grabbed her left arm and pulled it "way up" behind her neck, (Stephan Dep. at 54; Han Dep. at 46), and applied so much pressure on top of her that she "couldn't breathe" (Stephan Dep. at 54). And she did so even though Stephan was a small, unarmed, 21-year old female outnumbered five to one. Viewing the facts in

11

the light most favorable to Stephan, her noncompliance and confrontational attitude might have justified some force, but not the amount force she says Heinig used. *See*, *e.g.*, *Meirthew v. Amore*, 417 F. App'x 494, 497 (6th Cir. 2011) ("While she was non-compliant in refusing to spread her feet, a reasonable jury could find that Meirthew posed no danger and the use of the arm-bar takedown was unreasonable under the circumstances.").

Moving to the second prong of the qualified immunity inquiry, "[T]he Supreme Court has made clear that the *sine qua non* of the 'clearly established' inquiry is 'fair warning.'" *See Baynes v. Cleland*, 799 F.3d 600, 612–13 (6th Cir. 2015) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Baynes*, 799 F.3d at 610 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). However, "government officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Baynes*, 799 F.3d at 611. "Although the focus of the clearly established prong is whether the official had notice that his alleged conduct was improper, . . . qualified immunity is an objective rather than a subjective inquiry." *Id.* at 610–11 (citations omitted).

A reasonable firefighter or paramedic should have known that the force Heinig allegedly used was excessive. As discussed above, a reasonable jury could find that Stephan was subdued and not actively resisting by the time Heinig intervened. Officer Barnes had arguably already neutralized any minimal threat that Stephan posed. Barnes had restrained Stephan by grabbing her right arm "so [she] wouldn't do anything," and Stephan complained that Barnes was hurting her. (Stephan Dep. at 53–54.) Yet, Stephan says that Heinig then not only joined in but also twisted Stephan's arm behind her "way up" and "jumped" on top of her and applied so much

12

pressure with her knee—or possibly her entire body—that Stephan could not breathe. (Stephan Dep. at 53–54.) As the Sixth Circuit has noted, the law "ma[kes] clear that an officer may not gratuitously use force to inflict pain on an already neutralized or incapacitated suspect." *See Lustig v. Mondeau*, 211 F. App'x 364, 371 (6th Cir. 2006) (holding that excessive force claim survived summary judgement where plaintiff alleged that an officer "repeatedly and gratuitously applied additional force" by twisting her arm even though she "posed no threat to safety, did not attempt to flee, offered at most passive resistance to the officers, and was already under the officers' physical control"); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004) (observing that "[c]reating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable excessive force.")

Defendants argue that Heinig could not have violated any clearly established constitutional right under the Fourth Amendment because she was there to provide medical assistance. (Defs.' Mot. at 7.) Defendants rely on *Peete v. Metro. Gov't of Nashville & Davidson Cnty.*, 486 F.3d 217, 220 (6th Cir. 2007), where the Sixth Circuit noted that "there are no cases applying the Fourth Amendment to paramedics coming to the aid of an unconscious individual as a result of a 911 call by a family member." But *Peet* was a case in which paramedics inadvertently killed an unconscious seizure victim while *providing medical assistance*. *Id.* The Court held that the paramedics were entitled to qualified immunity at the motion to dismiss stage for an excessive force claim because "improper medical treatment by a government employee, standing alone, does not violate the Fourth or Fourteenth Amendment." *Id.* at 222. The Court reasoned that "where the purpose is to render solicited aid in an emergency rather than to enforce the law, punish, deter, or incarcerate, there is no federal case authority creating a constitutional

13

liability for the negligence, deliberate indifference, and incompetence alleged in the instant case." *Id.* at 221.

But here, Heinig likely did not act with a medical purpose when she used force against Stephan. While Heinig may have initially acted to provide medical aid, having responded to the call regarding Stephan's seizure, at the time she assisted a police officer's efforts to contain Stephan's outburst, she was almost certainly acting in a law enforcement capacity. In any case, *McKenna v. Edgell*, 617 F.3d 432, 441 (6th Cir. 2010), makes clear that a factual dispute concerning a first responder's role is a question for a jury to handle.

In *McKenna*, police officers initially responded to a seizure victim to provide medical aid, but they allegedly expanded their role into restraining him and searching his home, leading to a Fourth Amendment claim against them. *Id.* at 435. The Sixth Circuit affirmed the district court's denial of a judgment notwithstanding the verdict against police officers because, "whether the officers were entitled to qualified immunity depends on whether they acted in a law-enforcement capacity or in an emergency-medical-response capacity"—a factual dispute that the jury had already resolved at trial. *Id.* at 439–431, 443. The Court suggested that this holding would extend to paramedics as well: "[i]t would not be coherent, for example, to say that paramedics who strap a patient to a gurney without medical need, search his home for evidence of a crime, and forward what they discover to the police do not violate the Fourth Amendment, simply because they are paramedics." *Id.* at 439; *see also Michigan v. Tyler*, 436 U.S. 499, 506 (1978) (noting in Fourth Amendment search context that "there is no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman").

On this record, Heinig is not entitled to qualified immunity as a matter of law. A reasonable jury could find that she used excessive force when she helped Officer Barnes restrain Stephan. And a reasonable jury could find that Heinig acted in a law enforcement role at the time, meaning her alleged use of force, if true, violated clearly established law.

**2.**

A different outcome is warranted for Stephan's excessive force claim against Torok and Paul. They were mere bystanders, as Stephan does not suggest either one had any physical contact with her. The Court thus agrees with Defendants that Stephan's § 1983 claims against Torok and Paul must be dismissed as a matter of law.

"A police officer may be held liable for failure to intervene during the application of excessive force when: '(1) the officer observed or had reason to know that excessive force would be or was being used; and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'" *Goodwin v. City of Painesville*, 781 F.3d 314, 328 (6th Cir. 2015) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). The Sixth Circuit has held that other types of state actors beyond police officers—including medical personnel—can be liable under § 1983 for failure to intervene. *See Durham v. Nu'Man*, 97 F.3d 862, 868 (6th Cir. 1996) (holding that a nurse at a state mental health hospital could be liable under § 1983 for failure to intervene in security officers' ten-minute beating of patient, part of which she observed). Still, "courts have been unwilling to impose a duty to intervene where . . . an entire incident unfolds in a matter of seconds." *Ontha v. Rutherford Cnty., Tenn.*, 222 F. App'x 498, 506 (6th Cir. 2007) (internal quotation marks and citations omitted).

Stephan fails to address Defendants' argument that Torok and Paul cannot be liable here because they had no opportunity to intervene. (*See* Defs.' Mot. at 5–6.) She thus cites no

15

evidence to support a finding that either Torok or Paul "observed or had reason to know that excessive force would be or was being used" or "had both the opportunity and the means to prevent harm from occurring." *See Goodwin*, 781 F.3d at 328. Nor could she. The incident was too brief. Barnes, for instance, said that it all happened in a matter of seconds (Barnes Dep. at 24–25), and Heinig said that it happened "very quickly" (Heinig Dep. at 21). And Stephan challenges only Heinig's conduct, which was at the tail end of the struggle. Accordingly, Torok and Paul would not have had any reason to know that excessive force was being used until Heinig joined Barnes' efforts to restrain Stephan. That left no time for either of them to have had any realistic opportunity to prevent Heinig's use of force. *See Amerson v. Waterford Twp.*, 562 F. App'x 484, 490 (6th Cir. 2014) (holding that where "the span of time within which [defendant] should have perceived the excessive force and developed and implemented an intervention strategy could not have been more than a few seconds," the defendant "had no opportunity to prevent the alleged use of force, given that the alleged events took place quickly and without any forewarning.").

Accordingly, a reasonable jury could not find that Paul or Torok should be liable for failing to intervene. The Court will therefore dismiss as a matter of law Stephan's § 1983 claim against them.

### 3.

Stephan's Count III—a § 1983 claim against West Bloomfield Township and its Fire Department—also fails as a matter of law.

To start, only West Bloomfield Township, not its fire department, can be subject to a § 1983 claim. It has long been established that "[a] suit against a city police department in Michigan is one against the city itself, because the city is the real party in interest." *Haverstick*

16

*Enterprises, Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 997 n.1 (6th Cir. 1994). Michigan courts have made clear that the same is true for municipal fire departments. *See Armbruster v. Vill. of Akron, No. 221493*, 2001 WL 719094, at \*2 (Mich. Ct. App. June 26, 2001) ("It is well-settled that city departments, like a fire department, are not separate legal entities against which a tort action can be directed." (citing *McPherson v. Fitzpatrick,* 234 N.W.2d 566 (Mich. Ct. App. 1975))). Stephan cites no authority to the contrary, as she does not even address this issue.

As for her claim against West Bloomfield Township, Stephan has failed to present evidence even remotely close to establishing municipal liability. The Supreme Court addressed municipal liability under § 1983 in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). There, the Court held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. "There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). "The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Id.*

The thrust of Stephan's claim appears to be that West Bloomfield Township had a policy of inadequate training or supervision. (*See* Pl.'s Resp. at 14.) According to her Complaint, the alleged constitutional violations "were caused, acquiesced to, and or contributed to by Defendant West Bloomfield Twp. and Defendant West Bloomfield Twp. Fire Department's improper

training, policy procedures [sic] and culture of abusive/discriminatory first responders which has led to the establishment of a custom and practice to allow first responders who are placed in a role of safety and trustworthiness to abuse and taunt minorities." (Compl. ¶ 29.)

To succeed on an inadequate training claim, "a municipality's training must be inadequate to the tasks that its officers must perform, this inadequacy must be the product of deliberate indifference, and this inadequacy must have been closely related to or have actually caused the plaintiff's injury." *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003).

Stephan's cursory argument on this issue is unpersuasive. The only evidence that she cites to support her claim is that "Lt. Paul . . . is known as 'annoying' to his co-workers, specifically Glashauser" and that "Torok testified that he believed Lt. Paul to find it offensive when patients spoke in another language, as he did himself." (Pl.'s Resp. at 14.) This, she says, "presents at a least a question of fact regarding whether WB Township accepted the practice of taunting and intimidation by its EMS/paramedics." (Pl.'s Resp. at 14.) It does not. The testimony that Stephan cites does not even relate to the sole underlying constitutional violation she asserts: Heinig's alleged use of excessive force. If she instead meant to suggest that the basis of her *Monell* claim is a different constitutional violation, she has made no argument whatsoever nor pointed to any other evidence establishing that another type of constitutional violation occurred. And, "[w]here, as here, a municipality's liability is alleged on the basis of the unconstitutional actions of its employees, it is necessary to show that the employees inflicted a constitutional harm." *Ewolski v. City of Brunswick*, 287 F.3d 492, 516 (6th Cir. 2002) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

Even construing her vague claim more generously to encompass an unwritten policy condoning excessive force, it still fails. "[W]here a policy of tolerating federal rights violations is

18

unwritten but nevertheless entrenched . . . the plaintiff must show: (1) the existence of a clear and persistent pattern of [illegal activity]; (2) notice or constructive notice on the part of the [defendant]; (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the [defendant's] custom was the 'moving force' or direct causal link in the constitutional deprivation." *Thomas*, 398 F.3d at 429 (quoting *Doe v. Claiborne Cnty., Tenn. By & Through Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 507–08 (6th Cir. 1996)). She has shown no "clear and persistent pattern" of any type of constitutional violation. Far from illustrating a pattern of abuse or intimidation, her own testimony describes that her frequent interactions with the West Bloomfield Fire Department were overwhelmingly positive until the November 2011 incident. For example, when she came to on the day of the incident, she says she saw among the responders "a lot of nice people that always took care of me." (Stephan Dep. at 28.) After the incident, she says that the firefighters have been "really rude" to her. (Stephan Dep. at 101.) But this is not enough to sustain a *Monell* claim.

Thus, Stephan's § 1983 claim against West Bloomfield Township and its fire department fails as a matter of law.

### B.

Defendants are also entitled to summary judgment on Stephan's gross negligence claim. Michigan law "reject[s] attempts to transform claims involving elements of intentional torts into claims of gross negligence." *See VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004) (citing cases). Therefore, "if a claim of gross negligence is premised on [an] alleged assault of plaintiff," summary disposition of the gross negligence claim is appropriate. *Norris v. Police Officers*, 808 N.W.2d 578, 584 (Mich. Ct. App. 2011). When faced with claims of gross

negligence, courts are to determine the "gravamen" of the action by "examining the entire claim." *Id.*; *see also Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011) ("[P]laintiff claims that defendants' alleged use of excessive force constituted gross negligence . . . . The only cause of action available to plaintiff for allegations of this nature would be for assault and battery."); *Livermore v. Lubelan*, 476 F.3d 397, 408 (6th Cir. 2007) ("Although her complaint is articulated in terms appropriate for a negligence claim (e.g., 'failing to understand'), Livermore's gross negligence claim against Sgt. Lubelan is undoubtedly premised on the intentional tort of battery.").

Stephan's pleadings surrounding gross negligence are no model of clarity. For instance, Stephan claims that "Defendants' conduct was so reckless and deliberate creation of an increasingly unpleasant situation [sic] that it arose to the level of gross negligence pursuant to MCL 257.401." (Compl. ¶ 24.) Yet, oddly, that provision governs civil liability for negligent operation of motor vehicles. *See* Mich. Comp. Laws Ann. § 257.401. But the "gravamen" of her gross negligence claim is excessive force. To support her gross negligence claim, she avers in her brief that "Heinig here intentionally brought Ms. Stephans to the ground, without necessity in a forceful manner without regard to whether the action of her 200+ pounds would injure this 100 pound weak little waif of a girl." (Pl.'s Resp. at 16.) She fails to explain how this claim is based on anything other than the same intentional conduct that gave rise to her excessive force claim.

Furthermore, Stephan's claim that "West Bloomfield [Township], Fire Department is responsible under the theory of Respondeat Superior for the grossly negligent actions of its employees while they were engaged in a governmental function," (*See* Compl. ¶ 25), also fails as a matter of law. As discussed above, the Fire Department is not amenable to suit under Michigan

law. Unlike in her § 1983 claim, her Complaint does not specify that her gross negligence claim applies to West Bloomfield Township itself.

But even construing her claim to be against the township, under Michigan law, a "governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." *See* Mich. Comp. Laws Ann. § 691.1407. Some exceptions apply, *see Odom v. Wayne Cnty.*, 760 N.W.2d 217, 227 (Mich. 2008) (listing statutory exceptions), but Stephan identifies no applicable one. And her Complaint concedes that the firefighters' "were engaged in a governmental function and acting on behalf of a governmental agency," putting the township squarely within immunity under § 691.1407. (Compl. ¶ 25.) Moreover, the law supports the Complaint's admissions. To determine whether activity was performed as part of a governmental function, Michigan courts "look to the general activity involved rather than the specific conduct engaged in when the alleged injury occurred." *Ward v. Michigan State Univ. (On Remand)*, 782 N.W.2d 514, 519 (Mich. Ct. App. 2010). The general activity here—the provision of emergency medical services—was clearly a governmental function. *See Omelenchuk v. City of Warren*, 647 N.W.2d 493, 497 (Mich. 2002) ("In the present case, it is beyond reasonable dispute, and thus we take judicial notice, that the relevant activity of the city's fire department was part of its discharge of its governmental functions, and not part of any proprietary function.").

Thus, Stephan's gross negligence claim fails as a matter of law as to all Defendants.

## C.

Remaining are two claims that the parties briefed but were not expressly asserted in Stephan's Complaint. First, in her response brief, Stephan raised for the first time an assault and battery claim under Michigan law. (Pl.'s Resp. at 12–13.) While her Complaint's introduction

21

noted in passing that "Defendants' actions are outrageous, heinous and unjustified, and amount to gross negligence, negligent supervision, false imprisonment, excessive force, ethnic intimidation, *assault* and violation of her due process rights," the Complaint only includes three distinct counts: a § 1983 against the individual Defendants, a gross negligence claim, and a § 1983 against the township and fire department. (*See* Compl. ¶ 7 (emphasis added).) The Court will not consider at this late stage an assault and battery claim that Stephan declined to plead expressly before. *See Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 666 (6th Cir. 2012) ("[A] plaintiff may not expand [her] claims to assert new theories for the first time in response to a summary judgment motion.").

Additionally, though Stephan's Complaint mentions "racial intimidation" and "ethnic intimidation" in her Complaint, she does so only in passing and not expressly as a distinct count. (Compl. ¶ 7, 13.) Nonetheless, Defendants proactively addressed ethnic intimidation in their Motion for Summary Judgment. (Defs.' Mot. at 18–19.) Because both parties have briefed the issue, the Court will consider the arguments for whether summary judgment is appropriate for this claim.

Michigan Compiled Laws § 750.147b(3) provides a civil cause of action to "a person who suffers injury to his or her person or damage to his or her property as a result of ethnic intimation." The statute provides that a person is guilty of ethnic intimidation if:

> that person maliciously, and with specific intent to intimidate or harass another person because of that person's race, color, religion, gender, or national origin, does any of the following:
>
> (a) Causes physical contact with another person.
>
> (b) Damages, destroys, or defaces any real or personal property of another person.

(c) Threatens, by word or act, to do an act described in subdivision (a) or (b), if there is reasonable cause to believe that an act described in subdivision (a) or (b) will occur.

§ 750.147b(1). Stephan claims that Paul "mock[ed]" her "due to her Chaldean heritage." (Pl.'s Resp. at 15.) Along with his threat to arrest her, she says that this is sufficient for her to survive summary judgment. (*Id.*) The Court disagrees.

The parties dispute what exactly Paul did. Stephan says that he mocked her when she started to speak Chaldean on the phone with her mother. (Stephan Dep. at 33–37, 41–44.) Paul says that he simply crossed his arms and nodded. (Paul Dep. at 9–10.) But no evidence suggests that Paul had any physical contact with Stephan. *See* Mich. Comp. Laws § 750.147b(1)(A). Nor does any evidence support a finding that he threatened any physical contact "because of" Stephan's Chaldean heritage. *See* Mich. Comp. Laws § 750.147b(1). Paul may have mentioned the possibility of arrest, but he did so only before Stephan spoke Chaldean on the phone with her mother. (Glashauser Dep. at 15; Paul Dep. at 15–16.) And Stephan herself testified that only Heinig made the arrest threat. (Stephan Dep. at 25–26.) She provides no evidence that Paul knew she was Chaldean at the time he threatened to arrest her or that the arrest threat otherwise had any relationship to her Chaldean heritage. Accordingly, no reasonable jury could find Paul liable for ethnic intimidation.

## IV.

Stephan has raised a genuine issue of material fact as to whether Heinig's use of force was excessive. But she has not raised a genuine issue of material fact as to whether any other alleged conduct amounted to excessive force, gross negligence, or ethnic intimidation.

Accordingly, Defendants' Motion for Summary Judgment (Dkt. 34) is DENIED as to

Heinig for Count I but GRANTED in all other respects.

       SO ORDERED.

                              s/Laurie J. Michelson
                              LAURIE J. MICHELSON
                              UNITED STATES DISTRICT JUDGE

Dated:  November 6, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on November 6, 2015.

                              s/Jane Johnson
                              Case Manager to
                              Honorable Laurie J. Michelson